UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_UNITED STATES DISTRICT COURT_
_FILED_
_JUL 2 8 2017_
_MARY C. LOEWENGUTH, CLERK_
_WESTERN DISTRICT OF NY_

_____

JENNIFER LEE MILLIKEN,

               Plaintiff,

       v.

NANCY A. BERRYHILL[1],
Acting Commissioner of the Social Security
Administration,

               Defendant.

_____

**DECISION AND ORDER**

1:16-CV-00297 EAW

## **INTRODUCTION**

Plaintiff Jennifer Lee Milliken ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) and seeks review of the final decision of Nancy A. Berryhill, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Dkt. 1). Presently before the Court are the parties' opposing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 11; Dkt. 16). For the reasons set forth below, this Court finds that the decision of the Commissioner is not supported by substantial evidence in the record.

_____

[1]    Nancy A. Berryhill became Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted as the defendant in this suit.

Thus, Plaintiff's motion for judgment on the pleadings (Dkt. 11) is granted, and the Commissioner's motion is denied. (Dkt. 16).

## BACKGROUND

### I.    Overview

On October 31, 2011, Plaintiff filed a Title II application for DIB and protectively filed a Title XVI application for SSI. (Administrative Transcript (hereinafter "Tr.") at 229-45). In both applications, she alleged that she had been disabled since July 15, 2008, due to arthritis, the impact of prior back surgeries, and depression. (Tr. 238). Specifically, Plaintiff complained that she injured her back in 2002 while "rolling" a patient while working as a Certified Nursing Assistant ("CNA"). (Tr. 46). Plaintiff's back pain worsened over time, and, on November 12, 2008, Plaintiff underwent an "anterior lumbar interbody fusion with cage screws and plate at L5-S1" due to lumbar instability syndrome and degenerative disk disease. (Tr. 305-08, 587-88). Dr. Douglas B. Moreland, M.D. ("Dr. Moreland"), from the Buffalo Neurosurgery Group, was the Attending Physician for the procedure. (Tr. 306). Dr. Moreland surgically placed a "cage" into Plaintiff's spine to separate her vertebrae, and then inserted "rods and pins." (Tr. 85). Plaintiff tolerated the procedure well and was discharged the following day. (Tr. 306). However, this surgery did not alleviate Plaintiff's back problems, and, on August 3, 2009, she underwent a second surgery where "pedicle screws and rods" were inserted into her L5-S1 spinal vertebrae. (Tr. 313). Plaintiff was also frequently

examined by Dr. Eugene J. Gosy, M.D. ("Dr. Gosy") for pain management, and she sought physical therapy to treat her pain. (Tr. 366-426, 527-543, 584-608, 654, 668).

On December 29, 2011, Plaintiff's applications were denied, (Tr. 102-113), and Plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ") on January 4, 2012. (Tr. 114-16). On February 15, 2013, Plaintiff appeared at a hearing before ALJ Nancy L. Pasiecznik, (Tr. 41-69), and on October 17, 2014, Plaintiff appeared at a second hearing before ALJ Donald T. McDougall ("ALJ McDougall" or "the ALJ"). (Tr. 72-91). Vocational Expert Jeanne Beechler (the "VE") also testified at the second hearing. (Tr. 87-89). On November 28, 2014, ALJ McDougall found that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 16-38). Plaintiff requested a review of that decision, (Tr. 11), and on February 8, 2016, the Appeals Council denied Plaintiff's request for review, making ALJ McDougall's decision the final decision of the Commissioner. (Tr. 6-8). On April 15, 2016, Plaintiff filed this action appealing the final decision of the Commissioner. (Dkt. 1).

## II.   **The Non-Medical Evidence**

### A. **Plaintiff's Function Report**

On December 5, 2011, Plaintiff completed a Function Report (Tr. 246-57) in which she reported pain in her back and down her legs that limited her activities. (Tr. 246). Plaintiff would take a nap soon after she woke each day because her pain medication made her tired. (Tr. 247). Before her injury, Plaintiff could stand longer, sleep through the night, take long walks, and walk up and down stairs without her back

hurting. (*Id.*). Plaintiff did not sleep well in any position, (*id.*), and due to her pain, she also had difficulty putting on pants and socks, or tying her shoes. (*Id.*).

Plaintiff reported that she could clean dishes or vacuum for about 10 minutes at a time before needing to rest. (Tr. 249). Plaintiff could also mow about half of her lawn, but someone else would have to finish it because of her pain. (*Id.*). Plaintiff was able to drive a car and go shopping, but she would use a shopping cart for support to prevent her back from hurting. (Tr. 249-50). Plaintiff also reported back pain while lifting, standing, walking for too long, sitting for too long, climbing stairs, kneeling, squatting, and reaching. (Tr. 251-52). Plaintiff could walk one block at a time before having to sit down and rest for a "couple of min[utes]." (Tr. 253).

Plaintiff described her pain "as a sharp but sometimes a dull pain that does not go away." (Tr. 254). The pain first began to affect her activities after she had surgery on her back. (*Id.*). Plaintiff also noted that her pain had begun to increase in intensity, and that it was chronic and persistent. (Tr. 255). Although Plaintiff's pain medication would help control her pain for about 3-5 hours, it was not always effective. (*Id.*).

**B. Plaintiff's Testimony**

Plaintiff was 42 years old on the day that the ALJ rendered his decision. (*See* Tr. 16, 229). At the hearing held on January 4, 2012, Plaintiff testified that she had a high school education and had completed a CNA course. (Tr. 43). Plaintiff was 5'2" tall and weighed 170 pounds. (*Id.*). Plaintiff lived at home with her aunt, mother, and two children, who were then 10 and 13 years old. (Tr. 45, 60, 63). Plaintiff had worked as a

CNA since 1996, but she had not worked at any job for pay since July 15, 2008. (Tr. 44-45). Plaintiff's last day of insurance coverage was December 31, 2013. (Tr. 44).

Plaintiff testified that she had injured her back in 2002 while "rolling" over a resident at her work place. (Tr. 46). When Plaintiff's injury slowly worsened, she engaged the services of Dr. Moreland, who performed her first surgery in 2007. (Tr. 47). Plaintiff testified that she was unable to return to work after this surgery, and engaged Dr. Moreland's services again for a second surgery in 2008. (Id.).[2]

Plaintiff further testified that she experienced sharp pain in her back when she bent or turned in a "certain way." (Id.). Plaintiff stated that a "sharp, stabbing" pain would travel down her right leg, and that her pain medication reduced the pain "a little bit." (Tr. 48). Plaintiff also reported numbness in the same leg, and rated the severity of her pain at about a six out of ten. (Tr. 49).

Plaintiff testified that lying on her stomach relieved the pain, and that she would usually lie down for about four hours a day. (Id.). However, Plaintiff would only sleep an average of three to four hours a night, waking up every hour due to her pain. (Tr. 50). Plaintiff took several medications, including Lortab, Mobic, and muscle relaxers, which eased her pain but did not completely alleviate it. (Id.).

---

[2]   Plaintiff appears to be mistaken in her testimony regarding the dates of her surgeries. (Tr. 313 (Dr. Moreland's notes indicating that the surgeries occurred on November 12, 2008, and August 3, 2009)).

Plaintiff could stand for about 10 minutes at a time, and could probably walk half a block before she needed a break. (Tr. 51). Plaintiff estimated that she could only spend an hour sitting, standing, or walking during an eight-hour period. (*Id.*). Plaintiff testified that she could only lift about five pounds, and that her position as a CNA required her to lift about eighty to one hundred pounds. (Tr. 52). Plaintiff had difficulty bending down or raising her arms above her head, and although Plaintiff lived on the second floor of her residence, she would usually only walk up and down the stairs twice a day. (Tr. 52-53).

Plaintiff further testified that she suffered from depression and anxiety, and that she took various medications to alleviate these issues. (Tr. 55-57). Plaintiff also used Methocarbamol, Meloxicam, Lortrab, and hydroxyzine pamoate to help control her pain. (Tr. 57). Plaintiff testified that her children helped her shop for groceries, and that she usually leaned on the shopping cart to support her back. (Tr. 60). Plaintiff was unable to drive for more than 15 to 20 minutes at a time without needing a break to walk around. (Tr. 61). Plaintiff's aunt assisted with the cooking, (*id.*), and while Plaintiff could clean the dishes or vacuum, she could only do so for five to ten minutes at a time before having to sit down and rest for an hour. (Tr. 62).

Plaintiff did not socialize as much since she could not sit or stand for very long, (*id.*), and she no longer enjoyed many hobbies, such as riding her bike and walking with her children, due to her back pain. (Tr. 63). Plaintiff also has had problems showering after her second surgery because she would lose her balance if she closed her eyes. (*Id.*).

Plaintiff testified that she had good and bad days, and that on a bad day, she would not get out of bed because of the pain. (Tr. 65). Plaintiff indicated that she had about four bad days a week, and that this would negatively affect her ability to keep a regular job schedule. (*Id.*). Plaintiff noted that her pain has worsened, and that she developed pain in her right leg after her second surgery in 2008. (Tr. 65).

Plaintiff then testified that after sitting for some time, she would have to get up and walk around for about 20 minutes before sitting again, and that simply standing up and stretching for a minute or two would not be sufficient. (Tr. 66). Plaintiff was then posed with a hypothetical as to whether she could work an eight-hour work day with appropriate breaks, and she responded that she did not believe she could successfully make it through the hypothetical workday because she took her pain medication every four hours and would feel very tired as soon as she used them. (Tr. 67-68). Plaintiff further testified that the rods and steel in her spine limited her ability to move to the side or twist. (Tr. 68).

At the hearing held on February 15, 2013, Plaintiff testified that she had sought vocational placement through a worker's compensation proceeding, but she was told to continue "basically doing the same thing [she] was doing." (*Id.*). Plaintiff also testified that all the jobs that were suggested for her required that she stand even though she could only do so for about five to ten minutes. (Tr. 78). After standing, Plaintiff had to sit down for about fifteen minutes before standing again; Plaintiff could only sit for fifteen

minutes before she experienced pain from sitting as well. (Tr. 79). In order to take pressure off her back, Plaintiff would lie down "basically almost all day." (*Id.*).

Plaintiff again testified that she could help wash the dishes, but because she could not stand long enough to finish them, someone else would have to finish them. (Tr. 80). Plaintiff estimated that she could probably move a gallon of milk from the counter to the fridge, if she was already standing. (*Id.*).

Plaintiff would usually take a nap about an hour after taking her pain medication. (Tr. 81). In addition, Plaintiff testified that Dr. Moreland had recently recommended a third spinal surgery. (Tr. 81-82). Plaintiff believed this procedure was necessary because "a nerve [wa]s being pinched" by "a buildup of calcium," which has caused her pain in her leg for about three months. (Tr. 82).

Plaintiff then testified that "[m]oving around" would worsen her pain, and that she would experience pain if she held up her arms for too long or moved her neck in a "certain way." (Tr. 83-84). Plaintiff also noted that during her first surgery, Dr. Moreland put a "cage" in her spine to separate her vertebrae and then inserted "rods and pins." (Tr. 85). Plaintiff testified that this surgery "didn't work," so Dr. Moreland inserted more pins and rods in her back during a second surgery. (*Id.*). Plaintiff indicated that her condition has not improved since the second surgery, and she is currently waiting on a "comp approval" for a third surgery. (Tr. 86).

### C. Vocational Expert's Testimony

The VE described Plaintiff's past work as a CNA, which had a Specific Vocational Preparation rating of four with medium strength demand. (Tr. 88). The ALJ then posed a hypothetical:

> [Assume] a person of the same age, education, and work experience as the claimant, but assume a hypothetical person who's limited to light work as that's defined in the [C]ommissioner's regulation, but there'd be additional limitations. The person should not be exposed to extreme cold, heat, wetness, or humidity. And the person should be able to change positions from sitting to standing or vice versa at least every half hour for a brief period, a minute or two. And no ladders, ropes, scaffolds. No kneeling or crawling. No more than occasional balance, stoop[ing], or crouch[ing]. No work at heights or around dangerous moving machinery. And no more than occasional stairs or ramps. Would such a person be able to do any jobs at the light or sedentary level?

(*Id.*). The VE stated that such a person might be able to work as a cashier, storage facility clerk, or food order clerk. (Tr. 88-89). The VE noted that such a person would have to be capable of maintaining a regular schedule to work full-time. (Tr. 89).

### III.   Summary of the Medical Evidence

The Court assumes the parties' familiarity with the voluminous medical evidence in this case. Therefore, only a brief summary is necessary.

### A. Dr. Eugene J. Gosy

On July 2, 2008, Plaintiff reported to Dr. Gosy that she was struggling with pain control and had missed multiple days of work due to severe back pain. (Tr. 392). Plaintiff "[w]alked with a nonantalgic gait," but had tenderness at the sciatic notch

bilaterally. (Tr. 393). Plaintiff did not exhibit "signs of acute distress," and her strength in the upper and lower extremities was 5/5 bilaterally. (*Id.*). Plaintiff was diagnosed with low back pain/lumbago and Myofacial Pain Syndrome, and prescribed several pain medications. (*Id.*). Plaintiff was assessed with a "mild partial" disability. (*Id.*).

On February 16, 2010, Plaintiff returned to Dr. Gosy and reported daily aching and throbbing pain in her lower lumbar territory, which was aggravated by prolonged activity or heavy lifting. (Tr. 394). Plaintiff attended physical therapy twice a week, and rated the severity of her pain at 6/10. (*Id.*). Plaintiff did not exhibit any "signs of acute distress," and while she walked with a "normal gait," Dr. Gosy noted that Plaintiff had tenderness at the lower lumbosacral segments bilaterally and decreased extension. (Tr. 395). Plaintiff's strength in her upper and lower extremities was 5/5 bilaterally. (Tr. 396). Plaintiff continued her pain medications, was again assessed with a "mild partial" disability, and was determined to suffer from a 25% temporary impairment. (*Id.*).

On March 30, 2010, Plaintiff reported continuing aching pain in the lower lumber territory, which she rated as 5/10 in severity. (Tr. 397). Plaintiff walked with a normal gait, but appeared to be in "moderate distress." (Tr. 399). Dr. Gosy noted that Plaintiff had "[t]enderness at the lower lumbosacral segments bilaterally," and had decreased extension. (*Id.*). Plaintiff was again diagnosed with lumbago and kept on pain medications. (Tr. 399-400). Plaintiff was assessed with a 25% temporary impairment. (Tr. 400).

On April 29, 2010, Plaintiff stated that the aching pain in her lower lumbar territory had spread to her lower limbs. (Tr. 401). Plaintiff did not appear to be in acute distress, and she walked with a normal gait. (Tr. 402). Plaintiff had tenderness in the lower lumbosacral segments bilaterally, and had decreased extension. (*Id.*). Dr. Gosy assessed Plaintiff as being 100% disabled from her prior occupation, but assessed her with a 50% temporary disability overall. (Tr. 403).

On June 30, 2010, Plaintiff noted that her pain remained unchanged. (Tr. 404). Plaintiff's prescription for Vistaril was discontinued as it caused extreme fatigue. (*Id.*). Plaintiff walked with a normal gait and had tenderness in her lower lumbosacral territory, as well as decreased extension. (Tr. 405). Plaintiff was assessed with a 50% temporary disability. (Tr. 406-07).

On September 29, 2010, Plaintiff described "aching, throbbing pain to the lower lumbar territory" radiating into her lower limbs, which she rated in severity as a 7/10 "on most days." (Tr. 408). Dr. Gosy noted that Plaintiff appeared to be in "moderate distress," and had "[t]enderness at the buttocks and lower lumbosacral territory bilaterally." (Tr. 409). Dr. Gosy increased Plaintiff's pain medication prescription, and Plaintiff was again assessed with a 50% temporary disability overall. (Tr. 410).

On January 13, 2011, Plaintiff noted that her symptoms remained unchanged, and she reported the severity of her pain as 6/10. (Tr. 411). Plaintiff reported that her pain medications "help[ed] by 80-90%"; however, Dr. Gosy noted that Plaintiff appeared to be in moderate distress. (Tr. 411-12). Plaintiff walked with a normal gait and had

- 11 -

"[t]enderness at the buttocks and lower lumbosacral territory bilaterally," as well as decreased extension. (*Id*.). Plaintiff was assessed with a 50% temporary disability overall. (*Id*.).

On April 13, 2011, Plaintiff reported "aching pain to the lower lumbar," and rated the severity of the pain at 8/10. (Tr. 414). Plaintiff indicated that the medication was "75% effective in consolidating her pain and increasing her functional capacity." (*Id*.). Plaintiff stated that her sleep was nonrestorative, and that she had experienced an increased number of lower back spasms since the onset of spring weather. (*Id*.). Plaintiff walked with a normal gait, but appeared to be in moderate distress, with decreased extension. (Tr. 416). Dr. Gosy increased the prescription for Plaintiff's pain medication. (*Id*.). Plaintiff was assessed with a 50% temporary impairment. (Tr. 417).

On May 13, 2011, Plaintiff reported aching pain and rated its severity at 8/10. (Tr. 418). Plaintiff stated that two of her medications caused undesirable side effects, (*id*.), and Dr. Gosy replaced them with additional prescriptions. (Tr. 420). Dr. Gosy noted that no signs of acute distress were present, and that Plaintiff walked with a normal gait but had decreased extension. (*Id*.). Plaintiff had "[t]enderness at the buttocks and lower lumbosacral region bilaterally." (*Id*.). Plaintiff was assessed with a 50% temporary impairment. (Tr. 421).

On July 13, 2011, Plaintiff's symptoms remained unchanged, and she rated the severity of her pain at 7/10. (Tr. 422). Plaintiff's sleep remained nonrestorative, (*id*.), and she appeared to be in "mild-moderate distress," but walked with a normal gait. (Tr.

- 12 -

424). Plaintiff had "[t]enderness at the buttocks and lower lumbosacral segments bilaterally," and decreased extension. (*Id*.). Plaintiff was assessed with a 50% temporary impairment. (*Id*.).

On October 13, 2011, Plaintiff described her pain as a "deep aching, throbbing pain across the lower lumbar territory" that radiated to her lower limbs, which she rated at 9/10 in severity. (Tr. 426). Plaintiff appeared to be in "moderate distress and pain," and walked with a "slow gait." (Tr. 428). Plaintiff had "[t]enderness at the buttocks and lower lumbosacral segments bilaterally," with decreased extension. (*Id*.). Plaintiff was assessed with a 50% temporary impairment. (Tr. 429).

On December 1, 2011, Plaintiff's symptoms remained unchanged, and she rated the severity of her pain at 8-9/10. (Tr. 533). Plaintiff appeared to be in "moderate distress and pain," and walked with a "slow gait." (Tr. 535). Plaintiff had "[t]enderness at the buttocks and lower lumbosacral segments bilaterally," with decreased extension. (*Id*.). Plaintiff was assessed with a 50% temporary impairment. (Tr. 536).

On March 1, 2012, Plaintiff's symptoms remained unchanged, but she rated the severity of her pain at 5/10. (Tr. 537). Plaintiff walked with a "slow gait," but displayed no signs of acute distress. (Tr. 539). Plaintiff showed "[t]enderness at the lower lumbosacral segments bilaterally," and had decreased extension. (*Id*.). Plaintiff was assessed with a 50% temporary impairment. (Tr. 540).

On June 1, 2012, Plaintiff was doing "reasonably well," even though she reported "low grade aching pain to the lower lumbar territories." (Tr. 541). Plaintiff's

medications were "helpful and well tolerated without adverse effects." (*Id.*). Plaintiff walked with a "slow gait," but was not in acute distress. (Tr. 543). Plaintiff showed "tenderness at the lower lumbosacral territories bilaterally," but extension "was without pain." (*Id.*). Plaintiff was assessed with a 50% temporary impairment. (Tr. 544).

On October 10, 2012, Plaintiff again described an "aching pain" in the lower lumbar territory, which radiated to the lower limbs. (Tr. 545). Plaintiff noted that her medication was "helpful and well tolerated." (*Id.*). However, Plaintiff walked with a "slow gait" and had "[t]enderness at the lower lumbosacral segments bilaterally." (Tr. 547). Plaintiff displayed no signs of acute distress, and her extension "was without pain." (*Id.*). Plaintiff was assessed with a 50% temporary impairment. (*Id.*).

On January 10, 2013, Plaintiff reported "increased pain," and Dr. Gosy noted that the "pain control remain[ed] suboptimal." (Tr. 582). Plaintiff appeared to be in "moderate distress," had "[t]enderness at the lower lumbosacral segments bilaterally," and walked with a "slow gait." (Tr. 584). Her extension and forward flexion caused discomfort. (*Id.*). Dr. Gosy prescribed further pain medications to address Plaintiff's increased pain levels. (*Id.*). Plaintiff was also instructed to proceed to physical therapy, one to two times a week, for eight weeks. (*Id.*). Plaintiff was assessed with a 50% temporary impairment. (Tr. 585).

On January 23, 2013, Plaintiff's symptoms remained unchanged. (Tr. 594). Plaintiff did not appear to be in acute distress, but she walked with a "slow gait." (Tr. 596). Her extension and forward flexion caused discomfort, and Dr. Gosy also observed

"[t]enderness at the lower lumbosacral segments bilaterally." (*Id.*). Plaintiff was assessed with a 50% temporary impairment. (Tr. 597).

On April 10, 2013, Plaintiff reported an "aching pain" in the lower lumbar territory that radiated down into the lower limbs bilaterally, and she assessed the severity of the pain at 5/10. (Tr. 598). Plaintiff stated that the pain was "making her quite miserable." (*Id.*). Plaintiff appeared to be in "mild-moderate distress," walked with a "slow gait," had "[t]enderness at the lower lumbosacral segments bilaterally," and she experienced discomfort with extension and forward flexion. (Tr. 600). Plaintiff was assessed with a 50% temporary impairment. (Tr. 601).

On July 12, 2013, Plaintiff indicated that she continued to experience "low grade, aching pain across the lower lumbar territory" and lower extremities bilaterally. (Tr. 602). Although Dr. Gosy did not observe any signs of acute distress, Plaintiff walked with a "slow gait," had "[t]enderness at the lower lumbosacral segments," and experienced discomfort at extension and forward flexion. (Tr. 604). Plaintiff was assessed with a 50% temporary impairment. (*Id.*).

On October 11, 2013, Plaintiff reported increased pain in her lower right leg. (Tr. 606). Dr. Gosy noted that Plaintiff had since received lumbar MRIs from Dr. Moreland, "which were unremarkable." (*Id.*). Dr. Gosy observed no signs of acute distress, but Plaintiff walked with a "slow gait," indicated "[t]enderness at the lower lumbosacral segments," and felt discomfort in extension and forward flexion. (Tr. 608). Dr. Gosy

requested physical therapy, once to twice a week, for six weeks. (*Id.*). Plaintiff was assessed with a 50% temporary impairment. (Tr. 609).

On January 14, 2014, Plaintiff reported that she had aching pain, muscle spasms, and increased difficulty bearing weight early in the morning. (Tr. 610). Plaintiff appeared to be in "mild-moderate distress," and walked with a "slow gait." (Tr. 612). Plaintiff had tenderness at the lower lumbosacral segments, and she experienced discomfort in extension and forward flexion. (*Id.*). Plaintiff was assessed with a 50% temporary impairment. (Tr. 612-13).

On April 15, 2014, Plaintiff rated the severity of her pain at 8/10, reporting that the pain was most prominent in the morning and was accompanied by stiffness and difficulty bearing weight. (Tr. 660). Plaintiff requested facet blocks to assist with her pain management, as it had previously helped consolidate her pain "by greater than 75% allowing for increased range of motion, strength, endurance and functional capacity for a period of 2-3 months." (Tr. 661). Plaintiff appeared to be in "mild-moderate distress," walked with a "slow gait," and had "[t]enderness at the middle right lumbosacral segments and lower lumbosacral segments bilaterally." (Tr. 662). Extension and forward flexion also caused Plaintiff discomfort. (*Id.*). Plaintiff's lower extremity strength was rated at 4/5, and Dr. Gosy requested facet block treatment. (*Id.*). Plaintiff was assessed with a 50% temporary impairment. (Tr. 663).

Plaintiff underwent facet block treatment on June 5, 2014. (Tr. 664). On July 3, 2014, Plaintiff returned to Dr. Gosy for a follow-up, reporting that the facet block was

"minimally beneficial," and rating the severity of her pain at 8-9/10.  (Tr. 666).  Plaintiff

walked with a "slow gait" and experienced "[t]enderness at the middle right lumbosacral

segments and lower lumbosacral segments bilaterally."  (Tr. 668).  Plaintiff also felt

discomfort from extension and forward flexion.  (*Id.*).  Plaintiff's lower extremity

strength was again rated at 4/5.  (*Id.*).  Plaintiff was assessed with a 50% temporary

impairment.  (*Id.*).

On October 3, 2014, Plaintiff reported "aching low grade throbbing pain" at a

severity of 6/10.  (Tr. 670).  Plaintiff informed Dr. Gosy that she had been consulting

with Dr. Moreland regarding further surgical intervention on her back, but that she

planned to first pursue physical therapy.  (*Id.*).  Dr. Gosy did not observe any signs of

acute distress, but Plaintiff walked with a "slow gait" and had "[t]enderness at buttocks

and lower lumbosacral segments bilaterally."  (Tr. 672).  Plaintiff also experienced

discomfort during extension and forward flexion.  (*Id.*).  Plaintiff was assessed with a

50% temporary impairment.  (Tr. 673).

## B. Buffalo Neurosurgery Group (Dr. Douglas B. Moreland and Dr. John G. Fahrbach)

On January 26, 2010, Plaintiff followed up with Dr. Moreland and reported that

she had been attending physical therapy twice a week, and that her leg pain had resolved.

(Tr. 313).  Plaintiff continued to suffer from constant low back pain, rating the severity of

that pain at 6/10, and reported that she was not sleeping well as a result.  (*Id.*).  Plaintiff

displayed a normal gait and station but also had tenderness to palpitation of the lumber

spine, paraspinal muscles. (Tr. 314). Plaintiff's range of motion of her back was limited in extension and flexion by 40% due to pain. (*Id.*). No further neurosurgical intervention was advised, and Plaintiff was recommended to continue the services of Dr. Gosy for pain management. (*Id.*). Plaintiff was assessed with a permanent partial disability of 50%. (Tr. 315).

On December 15, 2011, Plaintiff returned to Dr. Moreland and noted "gradually progressive pain" in her back going down to both her hips and her right leg, which she rated at 7-8/10 in severity. (Tr. 523). Plaintiff reported that the pain was affecting her "quality of life and ability to do simple and routine activities." (*Id.*). Plaintiff could not lie down without experiencing pain, and her pain worsened when she coughed, strained, bent, twisted, or turned. (*Id.*). Plaintiff appeared to be in "mild distress" and displayed a "slightly labored gait and station favoring her back." (Tr. 524). Plaintiff had depressed knee and ankle jerks bilaterally, but she demonstrated a normal range of motion of her back in all directions. (*Id.*). Dr. Moreland ruled out segmental instability or neural compression and ordered an MRI scan, flexion extension films, and hip x-rays. (*Id.*). Plaintiff was assessed with a 50% permanent impairment. (*Id.*).

Plaintiff's x-rays of the hip, pelvis, and lumbar spine did not reveal any fractures, osseous lesions, migration, or loosening. (Tr. 525, 528). A lumbar spine MRI revealed L5-S1 anterior and posterior fusion with no evidence of recurrent central stenosis or disc herniation, but mild to moderate left forminal stenosis was present. (Tr. 527). The MRI also revealed L4-L5 disc dehydration and disc bulge with an annular tear and small

central to right paracentral protrusion, and mild right and moderate left forminal stenosis. (*Id.*).

On January 3, 2012, Plaintiff reported low back pain and right leg pain, and she rated the severity of the pain at 7/10. (Tr. 529). Plaintiff had a normal gait and station, and her coordination was within normal limits. (Tr. 530). Plaintiff had some tenderness to the lumbar spine, paraspinal muscles, and her range of motion in her back was limited in extension and flexion due to pain. (*Id.*). Dr. Moreland noted that the MRI imaging did not show any significant adjacent segment disc herniation, neural forminal or central canal stenosis. (*Id.*). Plaintiff had some mild facet arthropathy at L4-L5, but there was no evidence of any lumbar instability. (*Id.*). Plaintiff was diagnosed with low back pain, lumbar radiculopathy, and status post ALIF L5-S1, posterolateral fusion L5-S1. (*Id.*). Plaintiff was assessed with a permanent partial disability of 50%. (*Id.*). No further neurosurgical intervention was recommended, and Plaintiff was once again recommended for pain management with Dr. Gosy. (*Id.*).

On September 5, 2013, Plaintiff reported that she had been experiencing "severe pain" in her back, which had been radiating down her left leg for six to eight weeks. (Tr. 639). Plaintiff rated the severity of the pain at 10/10, but she noted that it could sometimes drop to 7/10 and explained that the pain was worse in the morning and gradually improved throughout the day. (*Id.*). Plaintiff reported that the pain was affecting "her quality of life and ability to do simple and routine activities of daily living." (Tr. 640). Plaintiff appeared to be in mild distress, and had a labored gait and

station.  (*Id.*).   Dr. Moreland did not observe any subluxations or crepitations of Plaintiff's hip, knees, or ankles, and her strength and reflexes were normal in both lower extremities.  (*Id.*).   Dr. Moreland also noted that Plaintiff had no Hoffman's, clonus, Babinski, fasciculations, or atrophy.  (*Id.*).   Dr. Moreland opined that the cause of Plaintiff's pain remained unclear, and that it could be adjacent segment disease, pseudoarthrosis, neural compression, or just inflammatory.  (*Id.*).   Plaintiff was assessed with a temporary impairment of 50%, and Dr. Moreland requested an MRI scan and x-rays for further evaluation.  (*Id.*).

On September 24, 2013, Plaintiff reported that she continued to suffer from a significant amount of low back pain that radiated down her right-lower extremity, rating the severity of the pain at 8/10.  (Tr. 641).   Plaintiff also reported that her leg had felt weak.  (*Id.*).   Upon physical examination, Plaintiff did not show signs of acute distress.  (Tr. 642).   She had no tenderness to palpitation over her posterior lumbar spine or paraspinal muscles, and her gait and station were normal.  (*Id.*).   Plaintiff had no muscle atrophy, fasciculations or clonus, or any difficulty with heel and toe walking.  (*Id.*).

Dr. Moreland also reviewed Plaintiff's lumbosacral x-rays and determined that her instrumentation at L5-S1 was in good position, with no evidence of haloing, misalignment, or instability.  (*Id.*).   Plaintiff's MRI revealed post-operative changes at L5-S1, and there was minimal left paracentral disc herniation with very mild central canal stenosis and lateral foraminal stenosis at L4-5.  (*Id.*).   Plaintiff was assessed with a 50% temporary impairment.  (*Id.*).

On August 14, 2014, Plaintiff was seen by Dr. John G. Fahrbach, M.D. ("Dr. Fahrbach"), also of Buffalo Neurosurgery Group, where Plaintiff's chief complaint was bilateral buttock and lateral thigh pain. (Tr. 644). Plaintiff rated the severity of her pain at 10/10; however, she did not appear to be in acute distress. (Tr. 645). Plaintiff's gait and station were slightly slow, but she had a good range of motion of her lumbosacral spine, and was able to heel and toe walk. (Id.). Her reflexes, strength, and senses were all intact in both lower extremities. (Id.). Plaintiff showed no signs of muscle atrophy, fasciculations, or clonus, and had no pain with internal or external rotation of either hip. (Id.).

Dr. Fahrbach ordered an MRI to rule out any evidence of neural compromise above Plaintiff's spine fusion. (Id.). Dr. Fahrbach also ordered flexion extension films of Plaintiff's lumbosacral spine, as well as bilateral hip x-rays, to rule out instability syndrome of Plaintiff's lumbosacral spine and to ascertain evidence of any possible degenerative change in her hips. (Id.). Dr. Fahrbach's review of the lumbar and hip x-rays revealed a "solid fusion" at L5-S1 and no obvious instability or significant degenerative changes. (Tr. 646). Plaintiff was assessed with a 100% temporary impairment. (Tr. 645).

On September 9, 2014, Plaintiff returned to Dr. Moreland where she reported that her symptoms had continued to worsen since August. (Tr. 647). Plaintiff complained that the pain continued to radiate through her lower extremities bilaterally with associated paresthesias and leg weakness, rating the severity of that pain at 10/10. (Id.). Plaintiff

- 21 -

did not appear to be in acute distress and showed no tenderness to palpation across her lumbosacral spine. (Tr. 648). Plaintiff's lower extremity strength was 5/5 bilaterally, her gait and station were within normal limits, and she had no muscle atrophy, fasciculations, or clonus. (*Id.*). Plaintiff had "minimal difficulty with heel and toe walking," but her range of motion of both flexion and extension was limited due to pain. (*Id.*).

Dr. Moreland also reviewed the MRI ordered by Dr. Fahrbach, and he determined that there were post-operative changes at L5-S1, with a left-sided synovial cyst and associated central canal stenosis as well as foraminal narrowing at L4-5. (Tr. 648; *see* Tr. 658). There was also associated disc desiccation and bulging. (Tr. 648). Dr. Moreland opined that Plaintiff continued to suffer from significant low back pain with radiculopathy through her lower extremities as a result of degeneration at L4-5. (*Id.*). Dr. Moreland recommended a course of formal physical therapy and, if Plaintiff's symptoms failed to improve, the possibility of further surgical intervention in the form of continued fusion through L4-5 with cages, pedicle screws, and rods as needed on the left side. (*Id.*). Plaintiff was assessed with a 100% temporary impairment. (*Id.*).

### C. Lifetime Health Medical Group (Dr. Ann Wands and Physician Assistant Pamela Jull Burton)

On May 11, 2010, Plaintiff saw Physician Assistant ("PA") Pamela Jull Burton ("PA Burton"), of Lifetime Health Medical Group for treatment of her migraines and depression. (Tr. 455). Plaintiff reported experiencing a depressed mood, lack of

motivation, and sleep disturbance, accompanied by negative thoughts of death or suicide. (*Id.*).  Plaintiff was prescribed several medications.  (Tr. 456).

On September 30, 2010, PA Burton performed a physical exam, during which Plaintiff did not display any gait disturbance, psychiatric symptoms, bone/joint symptoms, or muscle weakness.  (Tr. 450).  No abnormalities were detected in Plaintiff's back/spine, and her range of motion was normal for her age.  (Tr. 451).

At a follow-up appointment on October 10, 2011, in relation to Plaintiff's depression, Plaintiff reported that "it [was] not difficult at all" to meet home, work, or social obligations.  (Tr. 435).  Despite this, Plaintiff also reported negative feelings of guilt or worthlessness, poor concentration, indecisiveness, restlessness or sluggishness, appetite change, and thoughts of death or suicide.  (*Id.*).

On November 21, 2012, Plaintiff was examined by Dr. Ann Wands, M.D. ("Dr. Wands"), also of Lifetime Health Medical Group, for complaints of hypertension, anxiety, and right sciatica pain.  (Tr. 577).  Plaintiff reported that her anxiety made it somewhat difficult to meet home, work, or social obligations.  (*Id.*).  Plaintiff again reported negative feelings of self-worth, (*id.*), and Dr. Wands diagnosed Plaintiff with Depressive Disorder NEC, Anxiety State NOS, Insomnia, and benign hypertension.  (Tr. 579).  Plaintiff returned for a follow-up on January 15, 2013, and Dr. Wands determined that Plaintiff's anxiety had improved but her moderate depression remained unchanged.  (Tr. 617-18).

- 23 -

On August 27, 2013, Plaintiff saw Dr. Wands in connection with her hypertension, anxiety, and depression. (Tr. 624). Plaintiff reported anxious/fearful thoughts, depressed mood, difficulty falling asleep, diminished interest or pleasure, and feelings of fatigue. (*Id.*). On November 15, 2013, Plaintiff returned for a follow-up regarding her hypertension, anxiety, and depression. (Tr. 629). While some improvement of her symptoms was noted, Plaintiff's depression made functioning somewhat difficult. (*Id.*). Dr. Wands noted that the depression was associated with Plaintiff's chronic pain. (*Id.*).

**D. Physical Therapy**

Plaintiff attended physical therapy at Ken-Ton Physical Therapy from May 6, 2009 to September 22, 2010. (*See* Tr. 316-55). On July 17, 2009, Physical Therapist ("PT") Julie Nitto Styn ("PT Styn") reported that Plaintiff complained of pain at the center of her sacrum. (Tr. 342). Plaintiff reported that she felt pain travel down both legs and that it was worse in the morning, but it was reduced with medication. (*Id.*). PT Styn determined that Plaintiff sat "with protracted shoulders and forward head," and that she did not have full knee strength on either leg. (*Id.*). Plaintiff was also tender along her spine at L5/S1. (*Id.*). Plaintiff was assessed with lumbar disc displacement with decreased core and lower extremity strength. (*Id.*).

On December 10, 2009, PT Gregg Strobino ("PT Strobino") noted that Plaintiff had recently undergone additional surgery to the posterior aspect of the spinal system in the lower lumbar region on August 3, 2009. (Tr. 344). Plaintiff indicated that she had to sleep in a prone position to relieve her pain. (*Id.*). PT Strobino noted that Plaintiff's gait

was "relatively within normal limits," but her "[t]runk mobility" was restricted 25% with side bending, 50% in extension, 50% in flexion, and 25% in rotation bilaterally. (*Id.*). Plaintiff's right knee was assessed at full strength, but her left knee presented some weakness. (*Id.*). Plaintiff had tenderness of the lumbar paraspinals with core weakness. (*Id.*). PT Strobino's listed short term goals for Plaintiff were to improve core strength, reduce neural tension, and improve lumbar mobility, while his long term goals were to achieve independent home management through a home exercise program. (Tr. 345).

Plaintiff was discharged from physical therapy on September 22, 2010, because she had received "the maximum functional benefits from physical therapy at that time." (Tr. 355). PT Strobino reported that Plaintiff had "done well with therapy" and was able to move about with higher function and less pain, but she still had some discomfort in the low back region. (*Id.*).

### E. State Agency Opinions

On December 7, 2011, Psychologist Sandra Jensen, Ph.D ("Dr. Jensen") performed a psychiatric evaluation on behalf of the Social Security Administration. (Tr. 467-70). Plaintiff reported waking up four times a night due to pain and that she felt "blue" because she wanted to be able to do her old job and other activities, but she denied thoughts of depression, anxiety, death, or suicide. (Tr. 467).

Dr. Jensen reported that Plaintiff's gait, posture, and motor behavior were normal, but Plaintiff had a dysphoric affect because "it is clear that she really is unhappy with where she is at this point in her life." (Tr. 468). Plaintiff was "able to do all activities of

daily living except as limited by back pain in which case her children help her." (Tr.

469). As for Plaintiff's vocational capabilities, Dr. Jensen reported that she was able to

> follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress without any difficulty.

(Tr. 469). Dr. Jensen discerned no psychological issues that would "significantly interfere with [her] ability to function on a daily basis." (*Id.*).

On December 19, 2011, Psychologist C. Butensky, Ph.D. ("Dr. Butensky"), a state agency review consultant, opined that Plaintiff's depressive disorder and anxiety disorder were not severe. (Tr. 471-83). Dr. Butensky also opined that Plaintiff had only mild mental functional limitations in the activities of daily living, maintaining social functioning, or maintaining concentration, persistence, and pace. (Tr. 481).

### III.  The Commissioner's Decision Regarding Disability

#### A.  Determining Disability Under the Social Security Act

For both Social Security Insurance and Disability Insurance Benefits, the Social Security Act provides that a claimant will be deemed disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see, e.g.*, *Quinn v. Colvin*, 199 F. Supp. 3d 692, 704 (W.D.N.Y. 2016). A disabling impairment is defined as "an

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). The burden is on the claimant to demonstrate that she is disabled within the meaning of the Social Security Act. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002). The individual will only be declared disabled if her impairment is of such severity that she is unable to do her previous work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination of disability at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The following five steps are followed:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.  If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.  If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

**B.    Summary of the ALJ's Decision**

In applying the five-step sequential evaluation in this matter, ALJ McDougall made the following determinations. Preliminarily, with respect to the period of disability and the DIB, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013. (Tr. 19). At step one of the evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 15, 2008, the alleged onset date. (Tr. 21).

At step two, the ALJ found that Plaintiff suffered from a severe physical impairment: a "vertebrogenic disorder of the low back." (Tr. 22). However, the ALJ also determined that Plaintiff's "medically determinable mental impairment of depressive disorder d[i]d not cause more than minimal limitation in [Plaintiff]'s ability to perform basic mental work activities, and is therefore non-severe." (Tr. 22; *see* Tr. at 23).

At step three, the ALJ found that Plaintiff's severe physical impairment did not qualify as an impairment listed in Appendix 1. (Tr. 24).

- 28 -

ALJ McDougall then assessed Plaintiff's Residual Functional Capacity ("RFC") in step four of the sequential analysis. (Tr. 24-31). The ALJ found that Plaintiff:

> [H]as the [RFC] to perform light work . . . except [she] must be able to change positions briefly (one to two minutes) at least every one half-hour; she can have no exposure to extreme cold, heat, wetness, or humidity; no kneeling or crawling; no more than occasional balancing, stooping, or crouching; no work at heights or around dangerous, moving machinery; no climbing ladders, ropes or scaffolds; and no more than occasional climbing stairs or ramps.

(Tr. 24). In making his RFC determination, the ALJ followed a two-part process. First, the ALJ "determined whether there [was] an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce [Plaintiff's] pain or other symptoms." (*Id.*). Then the ALJ assessed the intensity, persistence, and limiting effects of Plaintiff's symptoms, and made findings of credibility "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms [were] not substantiated by objective medical evidence. . . ." (Tr. 25).

At part one of the RFC analysis, ALJ McDougall found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms. . . ." (Tr. 26). However, at part two of the RFC analysis, the ALJ found that Plaintiff's statements regarding "the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible." (*Id.*).

The ALJ provided an overview of the medical evidence, including the records provided by Drs. Gosy, Moreland, Fahrbach, Wands, Jensen, and Butensky. (Tr. 26-30).

The ALJ gave "significant weight" to the findings of Dr. Gosy and Dr. Moreland. (Tr. 30).

The ALJ found that Dr. Gosy's opinions "consistently reported [Plaintiff's] medications were helpful and well tolerated without adverse effects and her sleep was restorative with medications," and that Plaintiff "was able to maintain the activities of daily living." (Tr. 30-31). The ALJ found that Dr. Moreland's opinions were "only positive for some decreased range of motion of the lumbar spine in flexion and extension due to pain, and at times, some tenderness to palpation," while "consistently show[ing] her strength was normal in the upper and lower extremities, and her muscle tone, reflexes and sensation were intact bilaterally in the lower extremities." (Tr. 31). Further, the ALJ noted that "neither Dr. Gosy nor Dr. Moreland indicated that [Plaintiff] was totally disabled or unable to work (until very recently), nor did they give [Plaintiff] any specific limitations." (*Id.*).

The ALJ gave "great weight" to the opinions of Dr. Jensen and Dr. Butensky, which indicated that Plaintiff's psychiatric issues were non-severe. (Tr. 30). The ALJ noted that these were consistent with the treatment notes of Dr. Wands and Dr. Gosy. (*Id.*). The ALJ further noted that, although Dr. Wands prescribed anti-depressants, "she never recommended counseling or psychiatric care for [Plaintiff]." (*Id.*).

The ALJ found that, even though the August 18, 2014 opinion by Dr. Fahrbach and the September 12, 2014 opinion by Dr. Moreland both assessed a 100% impairment,

they were not binding on his decision. (Tr. 31). Further, the ALJ determined that Plaintiff's recent disability and pain exacerbation should not last for long. (Tr. 31).

The ALJ also found that Plaintiff's past relevant work as a CNA required an exertion level that exceeded Plaintiff's current RFC. (*Id.*). Therefore, the ALJ determined that Plaintiff was unable to perform her past relevant work. (*Id.*).

However, at step five, ALJ McDougall found that Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (Tr. 32). The ALJ based this determination on the testimony of the VE which indicated that Plaintiff could perform the requirements of occupations such as Cashier II, Storage Facility Clerk, or Food Order Clerk. (*Id.*). Therefore, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act from July 15, 2008, until the date of the ALJ's decision. (Tr. 32-33).

## DISCUSSION

### I.   Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). Judgment on the pleadings may be granted under Rule 12(c) of the Federal Rules of Civil Procedure where the "material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). "In reviewing a decision of the Commissioner, a court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the

decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.'" *Rehr v. Barnhart*, 431 F. Supp. 2d 312, 317 (E.D.N.Y. 2006) (quoting 42 U.S.C. § 405(g)). The Social Security Act directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

> Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.

*Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating Plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence on the record. *See Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (stating that a reviewing Court does not examine a benefits case *de novo*). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for Plaintiff's position. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

II.    **The ALJ's RFC Determination Regarding Physical Limitations is Not Supported by Substantial Evidence**

"Although the claimant has the general burden of proving that he or she has a disability within the meaning of the Act, because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Ubiles v. Astrue*, No. 11-CV-6340T(MAT), 2012 WL 2572772, at *7 (W.D.N.Y. July 2, 2012) (internal quotations omitted). This duty to develop the record exists even when the claimant is represented by counsel, *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009), and "includes assembling the claimant's complete medical history and recontacting the claimant's treating physician if the information received from the treating physician or other medical source is inadequate to determine whether the claimant is disabled," as well as "advising the plaintiff of the importance of such evidence." *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004). The ALJ is compelled to "investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 103-04 (2000). An ALJ may issue subpoenas "to ensure not only the production of a claimant's medical records, but also to obtain the testimony of necessary witnesses." *Devora v. Barnhart*, 205 F. Supp. 2d 164, 172 (S.D.N.Y. 2002) (citing 42 U.S.C. § 405(d)). "An ALJ is not obligated to order a consultative examination if the facts do not warrant or suggest the need for such an examination." *Brown v. Astrue*, No. 11-CV-6329T, 2012 WL 2953213, at *7 (W.D.N.Y. July 19, 2012). On the other hand, it is a reversible error for the ALJ to fail to obtain a

consultative examination if such an evaluation is necessary for the ALJ to make an informed decision. *Falcon v. Apfel*, 88 F. Supp. 2d 87, 90-91 (W.D.N.Y. 2000).

While the "ALJ cannot arbitrarily substitute his own judgment for a competent medical opinion," *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999), "the ALJ's RFC finding need not track any one medical opinion." *O'Neil v. Colvin*, No. 13-CV-575 (JTC), 2014 WL 5500662, at *6 (W.D.N.Y. Oct. 30, 2014). "Although [an] ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he [is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson*, 402 U.S. at 399). However, "[a]s a general rule, where the transcript contains only diagnostic evidence and no [supporting] opinion from a medical source about functional limitations . . ., to fulfill the responsibility to develop a complete record, the ALJ must recontact [an acceptable medical] source, order a consultative examination, or have a medical expert testify at the hearing." *Skupien v. Colvin*, No. 13-CV-403S, 2014 WL 3533425, *6 (W.D.N.Y. July 16, 2014) (quotation and citation omitted). This is because "[a]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Gross v. Astrue*, No. 12-CV-6207P, 2014 WL 1806779, *18 (W.D.N.Y. May 7, 2014) (quotation and citation omitted). "Accordingly, although the RFC determination is an issue reserved for the Commissioner, [w]here the medical

findings in the record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities, the Commissioner generally may not make the connection himself." *Alianell v. Colvin*, 14-CV-6655P, 2016 WL 981864, *12 (W.D.N.Y. Mar. 15, 2016) (quotations and citation omitted).

Plaintiff argues that the ALJ's RFC finding concerning her physical limitations is not supported by substantial evidence. (*See* Dkt. 11-1 at 21-28). Specifically, Plaintiff contends that, in the absence of medical opinions concerning Plaintiff's RFC, the ALJ "could have only relied on his lay opinion to assess [Plaintiff's] physical limitations." (*Id.* at 11-1 at 24).

Of course, the Commissioner's decision will not be remanded simply because an ALJ failed to obtain a medical source statement where "the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013); *see, e.g., Rosa*, 168 F.3d at 79 n.5 (noting that an ALJ is under no obligation to seek additional information where a claimant's medical records are complete). However, there must be sufficient evidence in the record upon which the ALJ can base her RFC. An ALJ's decision is not supported by substantial evidence when the ALJ has failed to fully develop the record. *Tejada v. Apfel*, 1667 F.3d 770, 774-76 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996).

In this case, there is a gap in the administrative record that the ALJ should have filled. Plaintiff's treating physicians did not submit a medical opinion evaluating Plaintiff's ability to work. The Commissioner relies upon *Tankisi* and *Johnson v. Colvin*,

669 F. App'x 44 (2d Cir. 2016) for the proposition that, where other evidence supports his finding, an ALJ may make a highly specific RFC determination without the assistance of a medical source opinion. (Dkt. 16-1 at 25-26); *cf. Cosnyka v. Colvin*, 576 F. App'x 43, 46 (2d Cir. 2014) (rejecting the ALJ's determination that the plaintiff required only six minute breaks every hour as not supported by any evidence).

However, Plaintiff is correct in distinguishing these cases. (Dkt. 17 at 2). In *Tankisi*, while there were no "formal opinions on Tankisi's RFC from her treating physicians," the record included "an assessment of Tankisi's limitations from a treating physician." *Tankisi*, 521 F. App'x at 34. In addition, the record in *Tankisi* contained opinions from a state disability examiner and two consulting physicians, one of whom provided clarifying information regarding the plaintiff's physical limitations. *See id.* (indicating that the plaintiff had "[m]ild to moderate limitation for sitting for a long time, standing for a long time, walking for a long distance, pushing, pulling, or heavy lifting." (citation omitted)).

In *Johnson*, the court determined that the ALJ's determination that the plaintiff was capable of light work was based on sufficient evidence, including a letter from the plaintiff's physician attesting to the plaintiff's functional limitations. *Johnson*, 669 F. App'x at 46-47. The court determined that the letter, in conjunction with other evidence considered by the ALJ, supported his conclusion. *See id.* at 46. ("Taken together, [the plaintiff's] testimony and Dr. D'Angelo's letter constitute "relevant evidence [that] a reasonable mind might accept as adequate to support the conclusion that [the] plaintiff

- 36 -

could perform "light work." (quoting *Richardson*, 402 U.S. at 402)). The court further opined that the physician's letter *alone* might not be adequate to support the ALJ's finding.

> While Dr. D'Angelo's letter alone might be inadequate to support the ALJ's finding, the conclusion that [the plaintiff] was capable of performing light work was supported by the other record evidence the ALJ considered. The fact that the ALJ relied on evidence beyond Dr. D'Angelo's letter distinguishes this case from those cited by [the plaintiff]. . . . Moreover, because the record contained sufficient other evidence supporting the ALJ's determination and because the ALJ weighed all of that evidence when making his [RFC] finding, there was no "gap" in the record and the ALJ did not rely on his "lay opinion."

*Id.* at 46-47 (citations omitted).[3]

The administrative record does not contain any medical opinions discussing the particular limitations set out in the ALJ's RFC, and the ALJ appears to extrapolate these

---

[3]    The Commissioner also relies upon *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5 (2d Cir. 2017) for the proposition that the ALJ was entitled to rely upon the years of treatment notes in the record. (Dkt. 16-1 at 26). However, while the ALJ in *Monroe* rejected the only medical source opinion in the record, the treatment notes in that case had direct bearing on the vocational and functional capacity of the claimant. *Monroe*, 676 F. App'x at 8 ("Not only do Dr. Wolkoff's notes include descriptions of Monroe's symptoms, but they also provide contemporaneous medical assessments of Monroe's mood, energy, affect, and other characteristics relevant to her ability to perform sustained gainful activity. The ALJ also considered Dr. Wolkoff's well-documented notes relating to Monroe's social activities relevant to her functional capacity—such as snowmobile trips, horseback riding, and going on multiple cruise vacations."). In contrast, ALJ McDougall merely summarized the treatment notes here, but failed to discuss how Plaintiff's documented physical limitations, symptoms, and pain management correlated with his RFC assessment. Certainly, as a lay person, the ALJ was not entitled to simply infer the propriety of his assessment from diagnostic data. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (determining that the ALJ "as a lay person" was "simply not in a position" to interpret the medical evidence).

- 37 -

restrictions, in part, from Dr. Gosy's repeated notations that Plaintiff "was able to maintain activities of daily living." (Tr. at 31); *see Burton v. Colvin*, No. 12-CV-6347 (MAT), 2014 WL 2452952, at *12 (W.D.N.Y. June 2, 2014) ("[The p]laintiff was performing these 'daily activities' at home, on her own schedule-not in the context of a competitive work environment where she would not be able to take breaks or rest as needed."); *see also Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005) ("The mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [his] credibility as to [his] overall disability. One does not need to be 'utterly incapacitated' in order to be disabled."). Indeed, Plaintiff indicated that the performance of many of these activities, such as lawn mowing, grocery shopping, driving, or even cleaning the dishes caused her significant pain upon prolonged engagement. (Tr. 60-62, 249-50); *see Palascak v. Colvin*, No. 11-CV-0592 (MAT), 2014 WL 1920510, at *9 (W.D.N.Y. May 14, 2014) ("[The p]laintiff testified, however, that she attended her daughters' school functions despite the fact that she experienced significant pain during them. It is unclear to this Court how occasionally attending a school function is equivalent to performing the equivalent of light work, 8 hours a day, for 5 days a week.").

Furthermore, the medical records that the ALJ cites in support of his RFC assessment, such as Dr. Gosy's opinion that Plaintiff's "medications were helpful and well tolerated," or that examinations showed Plaintiff's "muscle tone, reflexes and sensation were intact," do not speak to specific functional limitations. (Tr. 30-31); *see*

*Alianell*, 2016 WL 981864, at *12 (stating that an ALJ may not rely on bare medical diagnoses that do not relate to specific functional limitations); *Gross*, 2014 WL 1806779, at *18 (same).

Arguably, there is some evidence supportive of the ALJ's specific RFC limitations. The ALJ's assessment required that Plaintiff "must be able to change positions briefly (one to two minutes) at least every one-half hour." (Tr. 24). Plaintiff's functional capacity report indicates that she could walk a block at a time, but that she would have to sit down and rest for a "couple of min[utes]" before being able to walk again. (Tr. 253). However, this statement was not given in the context of the competitive and fast-paced atmosphere of the work environment, and there is no indication that permitting her to "change positions" every half hour for "one to two minutes" would be sufficient to enable Plaintiff to complete forty hours of light work every week. *See Dewey v. Barnhart*, 178 F. App'x 794, 798 (10th Cir. 2006) (determining that the ·plaintiff's statements regarding his daily activities "w[ere] quite equivocal in terms of providing a meaningful benchmark concerning [the] plaintiff's ability to stand and walk over the course of an entire eight-hour work day" because even though "plaintiff testified that he could stand for thirty minutes while doing the dishes, he was not asked how long he could stand over the course of an entire work day . . ." (citation omitted)); *see also Cosnyka*, 576 F. App'x at 46 ("There is no evidence in the record to the effect that Cosnyka would be able to perform sedentary work if he could take a six-minute break every hour, rather than some other duration and frequency amounting to ten percent of

the workday."). Moreover, the ALJ never mentioned this statement to support its RFC determination, and thus, this Court cannot create a post-hoc rationalization for the ALJ's decision. *See, e.g.*, *Kociuba v. Comm'r of Soc. Sec.*, 16-CV-0064 (GTS), 2017 WL 2210511, at *4 (S.D.N.Y. May 19, 2017); *Gable v. Colvin*, 15-CV-6302 (CJS), 2016 WL 3179901, at *4 (W.D.N.Y. June 8, 2016); *Hall v. Colvin*, 37 F. Supp. 3d 614, 626 (W.D.N.Y. 2014).

Furthermore, the same principles apply to the ALJ's determination that half hour breaks over the course of an eight hour day would be sufficient to enable Plaintiff to complete each work day. The ALJ does not point to any indication in the record as to why this particular duration would permit Plaintiff to finish forty hours of light work a week. *Cosnyka*, 576 F. App'x at 46. In addition, outside of Plaintiff's testimony that rainy weather worsened her back pain, (Tr. 64), there is no medical or other evidence supportive of the restrictions upon Plaintiff's work capacity for environmental conditions. Interestingly, even the State disability analyst, which is not considered a medical opinion, *Napierala v. Astrue*, No. 07-CV-0706, 2009 WL 4892319, at *6 (W.D.N.Y. Dec. 11, 2009), indicated that Plaintiff was not afflicted with any environmental limitations. (Tr. 95).

The ALJ also relies upon the various diagnostic notes indicating that Plaintiff was not deemed completely disabled until recently. (Tr. 31). Whether or not a treating physician has assessed a plaintiff as "disabled" or "not disabled" is not dispositive as it is the Commissioner who must make the ultimate decision under the Social Security Act.

*See Holste v. Colvin*, No. 15-CV-582-FPG, 2016 WL 3945814, at *4 (W.D.N.Y. July 19, 2016) ("In other words, a medical source statement that the claimant is 'disabled' or 'unable to work' does not mean the claimant is automatically disabled, and the lack of such a statement does not mean the claimant is able to work." (citation omitted)). Similarly, although the ALJ noted that neither Dr. Gosy nor Dr. Moreland provided any specific limitations for Plaintiff, (Tr. 31), "[a] treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting an ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment." *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001); *see Rosa*, 168 F.3d at 81 ("Those reports were consistent with this conclusion, however, only to the extent that they were silent on the issue. Indeed, there was no indication in the reports that the consultants intended anything by their silence or that they set out to 'express [an] opinion on [the] subject' of [the plaintiff's] sedentary work capacity."); *see also Covey*, 204 F. Supp. 3d at 507 ("[T]he only two medical opinions in the record were Dr. Pataki's opinion, which reached no conclusion regarding [the p]laintiff's physical capabilities, and Dr. Mafi's opinion, which the ALJ properly found was not material to the relevant time period. In other words, the record contained <u>no</u> competent medical opinion regarding [the p]laintiff's RFC during the relevant time period." (emphasis in original)). Here, Plaintiff has not been discharged from treatment and, in fact, has experienced heightened

sensations of pain and now faces the prospect of an additional surgery.  (Tr. 81-82, 86, 648).

Plaintiff is also correct insofar as she argues that the ALJ failed to perform a function-by-function analysis of her limitations.  (Dkt. 11-1 at 25).  "The [Social Security] Act's regulations require that the ALJ include in his RFC assessment a function-by-function analysis of the claimant's functional limitations or restrictions and an assessment of the claimant's work-related abilities on a function-by-function basis." *Palascak*, 2014 WL 1920510, at *10 (quotations and citations omitted).  "This means that the ALJ must make a function-by-function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch." *Holste v. Colvin*, No. 15-CV-582 (FPG), 2016 WL 3945814, at *4 (W.D.N.Y. July 19, 2016) (quotation and citations omitted).  The Second Circuit has declined to require that an ALJ perform a function-by-function analysis in every circumstance, and has upheld an ALJ's RFC determination where it provides an "adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous." *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).  "Remand may be appropriate, however, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* at 177-78; *Holste*, 2016 WL 3945814, at *4.  Here, as in *Holste*, the ALJ "sets forth the relevant medical evidence, but he fails to explain how that evidence

connects to the RFC determination" that Plaintiff can perform light work for an eight hour period punctuated by one to two minute breaks every half hour. *Holste*, 2016 WL 3945814, at \*4; *see Palascak*, 2014 WL 1920510, at \*10 ("The ALJ's RFC assessment simply recites [the p]laintiff's testimony and summarizes the medical record without tying this evidence to the physical and mental functional demands of light work."). Since "the ALJ's summary of the raw medical evidence fails to address [Plaintiff]'s functional abilities or link that evidence to the RFC . . .[, the decision] does not afford an adequate basis for meaningful judicial review." *Holste*, 2016 WL 3945814, at \*4.

The ALJ, as a non-expert, generally cannot interpret the medical evidence. *See Rosa*, 168 F.3d at 79 (determining that the ALJ "as a lay person" was "simply not in a position" to interpret the medical evidence). It is well-established, however, that "where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment." *Walker v. Astrue*, 08-CV-0828(A)(M), 2010 WL 2629832, at \*7 (W.D.N.Y. June 11, 2010) (quotations and citations omitted). This Court does not believe this principle is applicable here, where Plaintiff has received two surgical procedures to her vertebrae, was provided with an extensive pain management treatment routine for years, and now faces the prospect of a third surgery to her spine. *See Dale v. Colvin*, No. 15-CV-496 (FPG), 2016 WL 4098431, at \*4 (W.D.N.Y. Aug. 2, 2016) (determining that the "common sense judgment" principle was inapplicable where the record "contains complex medical findings like MRI results"); *Palascak*, 2014 WL

- 43 -

1920510, at *9 (W.D.N.Y. May 14, 2014) ("Given [the p]laintiff's multiple physical and mental impairments, this is not a case where the medical evidence shows relatively little physical impairment such that the ALJ can render a common sense judgment about functional capacity. (quotations and citation omitted)).

"'A pivotal finding' such as residual functional capacity that is 'unsupported by substantial evidence is not a harmless error.'" *Palascak*, 2014 WL 1920510, at *10 (quoting *Anderson v. Colvin*, No. 12-CV-1008 (GLS/ESH), 2013 WL 5939665, at *9 & n. 28 (N.D.N.Y. Nov. 5, 2013)); *cf. Wilson v. Colvin*, 136 F. Supp. 3d 475, 480 (W.D.N.Y. 2015) (holding that "[w]hile under ordinary circumstances the lack of an RFC assessment by a treating physician might, by itself, present a sizeable gap in a plaintiff's record," the report of an examining physician and voluminous "treatment notes identified and described [the] plaintiff's work-related limitations in the relevant functional areas"), *appeal withdrawn* (Jan. 26, 2016). Accordingly, remand is appropriate.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt. 16-1) is denied, Plaintiff's motion for judgment on the pleadings (Dkt. 11-1) is granted, and this matter is remanded for further administrative proceedings consistent with this Decision and Order.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:       July 28, 2017
             Rochester, New York